# AFFIDAVIT OF ATF SPECIAL AGENT MATTHEW SHIBLEY

I, Special Agent Matthew Shibley, being sworn, state as follows:

## INTRODUCTION

1. I have been a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") for approximately ten years. I am currently assigned to the Boston Group II Field Office and my duties include, among other things, the investigation of violations of laws related to firearms trafficking, firearm possession by prohibited persons, the use of firearms in drug trafficking crimes, and explosives and incendiary (arson) fires. I am a graduate of the ATF National Academy and of the Federal Law Enforcement Training Center.

2. During the course of my law enforcement career, I have participated in all aspects of drug investigations, including physical surveillance, surveillance of controlled purchase transactions, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses. I have also reviewed recorded conversations and telephone, financial, and drug records. Through my training and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, and the methods of payment for such drugs.

3. Based on my training and experience, I know that it is a violation of Title 21, United States Code, Section 841(a)(1), for any person to knowingly manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance. I am also aware that cocaine base, also known as "crack" cocaine, is a Schedule II controlled substance.

4. I make this affidavit in support of a criminal complaint charging MARVIN FORBES (DOB xx-xx-1980) with possession with intent to distribute and distribution of cocaine base, on or about the dates set forth herein, in violation of 21 U.S.C. § 841(a)(1).

5.      The statements contained in this affidavit are based on my own work in this investigation, my training and experience, and information provided by other agents, police officers, and witnesses. This affidavit is submitted for the limited purpose of establishing probable cause to believe that on or about the dates described herein FORBES violated 21 U.S.C. § 841(a)(1). It therefore does not set forth all of the information that I and other law enforcement personnel have obtained during the investigation.

## USE AND RELIABILITY OF A COOPERATING WITNESS; IDENTIFICATION OF MARVIN FORBES AS DRUG DEALER "MERV" & "RELL"

6.      Since approximately February 2019, the ATF has been engaged in investigations focusing on narcotics distribution and illegal firearm possessions occurring in and around Lucerne Street, Woodrow Avenue, and Irma Street in Boston, Massachusetts. The instant investigation is one of these investigations.

7.      A cooperating witness ("CW") was enlisted to assist in the instant investigation. The CW was instructed to identify and become acquainted with individuals in the Lucerne Street, Woodrow Avenue, and Irma Street areas and to gather evidence relative to drug distribution, illegal firearm possession, and/or acts of violence. To date, under ATF's direction, the CW has made multiple controlled purchases of narcotics.

8.      Since the start of my dealings with the CW, I have found the CW to be truthful and reliable, and I have found his/her information to be accurate and often independently corroborated by other evidence. The CW has multiple arrests and criminal convictions for forgery, uttering counterfeit notes, motor vehicle violations, disorderly conduct, impersonation, and telecommunications fraud. ATF pays the CW for his/her services and provides a Deferred Action on his/her immigration status.

9.      In February 2019, the CW received information regarding a drug dealer named "MERV" (later determined to be MARVIN FORBES). The CW obtained, from one of "MERV'S" associates, a description of MERV as a heavyset black male with braided hair and a cellular phone number (xxx-xxx-1852) for MERV. The CW was told that he/she would need to be introduced to MERV in order to purchase "crack" cocaine from MERV.

10.     I conducted a query of cellular phone number xxx-xxx-1852 in the ATF case management system for any prior defendants or suspects using that cellular phone number. The query identified a prior suspect named MARVIN FORBES. Additionally, I conducted a driver's license query for MARVIN FORBES, which showed a listed address of 36 Irma Street. I conducted a Massachusetts Board of Probation query, which showed MARVIN FORBES has prior firearm possession and drug distribution arrests and at least two convictions. I also conducted an INS Immigration Alien query, which showed that FORBES is not a United States citizen and that he was born in Jamaica. The query also showed that FORBES has an INS Final Order of Removal dated May 27, 2011. There is no evidence that FORBES has been deported from the United States. As detailed below, the CW made four controlled purchases of suspected crack cocaine from FORBES. Three of the sales were video-recorded. I have compared the Massachusetts license photograph of FORBES referenced above with the individual selling crack cocaine in the three video recordings and recognized that the person in the license photograph is the same person in the video recordings selling crack cocaine on those three occasions.

11.     In March 2019, at the direction of ATF, the CW began to make controlled purchases of crack cocaine from FORBES. The controlled purchases were conducted using the following standard procedures. Prior to each controlled purchase of crack cocaine, the CW had recorded telephone calls with FORBES to arrange the purchase of the crack cocaine. Prior to each

controlled buy of crack cocaine, the CW and the vehicle to be used by the CW were searched and found to be contraband free, the CW was equipped with a transmitting device and one or more audio/video recording devices, and the CW was provided with government funds for the purchase of the crack cocaine. The CW was then followed to the location of the sale. The sales were monitored by law enforcement via the transmitters. After each sale, the CW was followed back to the staging area for evidence transfer, contraband check, and debriefing.

12. In total, in March 2019 and April 2019, the CW made four controlled purchases of crack cocaine from FORBES. I conducted field tests on all the substances purchased from FORBES by the CW. All of the tests revealed the presence of cocaine. The CW and FORBES negotiated for the sale of crack cocaine, FORBES represented that his product was crack cocaine and the substances sold by FORBES to the CW appeared to be crack cocaine. I believe that there is probable cause that all of the drugs sold by FORBES to the CW were crack cocaine.

## PROBABLE CAUSE

### March 5, 2019 Purchase of Approximately 3.80 Grams of Cocaine Base from MARVIN FORBES; Identification of MARVIN FORBES as the Seller

13. On March 5, 2019, the CW conversed with FORBES' associate, who arranged for the CW to meet FORBES at the corner of Normandy Street and Intervale Street in Dorchester to purchase an "8 ball" (approximately 3.5 grams of crack cocaine) for $175.

14. Prior to the meeting, I met the CW at a staging area, where I searched the CW and an ATF undercover vehicle the CW was to use for contraband with negative results. I provided the CW with $175 of pre-recorded ATF buy money to make the crack cocaine purchase. I equipped the CW with covert electronic recording and monitoring equipment.

15. The CW drove the undercover vehicle to Intervale Street and parked at the corner of Intervale Street and Normandy Street. Surveillance vehicles were in the vicinity. FORBES was standing on the sidewalk. FORBES walked over to the ATF undercover vehicle and entered the front passenger seat.

16. The CW told FORBES that he/she needed his (FORBES') cellular phone number. The CW then handed FORBES the $175. FORBES took the money and counted it. FORBES, using his right hand, then placed the suspected baggie of crack cocaine inside the CW's right hand. FORBES then asked the CW where he/she was from and gave the CW his cellular phone number, which he stated aloud "xxx-xxx-1852." FORBES told the CW to call him "RELL." FORBES then told the CW to call when he/she (the CW) wanted to make another purchase. FORBES told the CW to make sure he/she came alone. FORBES told the CW that he was visiting a girl in the area and next time they would meet somewhere else. The CW responded okay and FORBES exited the ATF vehicle.

17. The CW then departed the area and met me at a predetermined location for evidence transfer and a debriefing. I took from the CW a small, tightly knotted baggie containing a rock-like substance. Based on my training and experience, the substance in the baggie appeared to be crack cocaine. I searched the CW for contraband with negative results.

18. I transported the baggie of suspected crack cocaine and the electronic equipment to the ATF office. The baggie was placed on a digital scale that showed a weight of 3.80 grams. I removed a small portion of the substance inside the baggie and placed it inside a Narcotics Analysis kit, which showed a positive color for cocaine. The baggie was then logged in as ATF evidence and was forwarded to the state drug lab for additional testing and certification (results pending). I copied the video/audio recording of the sale to a DVD and logged it in as ATF evidence. I viewed

the covert video recording and compared still frames of the seller with the driver's license photograph of FORBES. I confirmed that both individuals were the same person.

## March 8, 2019 Purchase of Approximately 3.70 Grams of Cocaine Base from MARVIN FORBES

19. On March 7, 2019, the CW made a recorded call to FORBES and arranged a crack cocaine purchase for the following day. The following day, the CW again made a recorded call to FORBES and was told to meet FORBES in the same area as the first sale, but to park in the back.

20. Prior to the CW driving to the designated area, the same pre-buy procedures outlined in paragraph 14 above were conducted. The CW departed the staging area operating the ATF undercover vehicle. The CW followed an unmarked ATF surveillance vehicle to Intervale Street. At approximately 1:55 p.m., the CW called FORBES' cellular phone and told FORBES that he/she was almost there. FORBES directed the CW to a parking lot off Normandy Street. The call was monitored and recorded via the audio/video recorder in the ATF undercover vehicle.

21. Shortly after the above-described call, while driving in an unmarked vehicle, I observed FORBES exit the driver's door of a dark Jeep Grand Cherokee (MA Registration) parked at the corner of Blue Hill Avenue and Lawrence Street, which is approximately a block from the parking lot off of Normandy Street referenced by FORBES.

22. Once the CW pulled into the parking lot specified by FORBES, the CW observed a parked black Jeep. The CW again called FORBES' cellular phone and asked if FORBES was in the vehicle. FORBES replied by telling the CW to come to the car. The CW got into the black Jeep. The CW then handed FORBES the $175 of ATF buy money. FORBES took the money and counted it. FORBES then removed a large plastic bag from the inside of his pants, which contained smaller pre-packaged plastic baggies of suspected crack cocaine. FORBES removed a smaller

pre-packaged plastic baggie and handed it to the CW. The CW exited the vehicle. The CW entered the ATF undercover vehicle and drove to a predetermined location to meet me.

23. At the predetermined meet location, I met the CW, turned off the electronic equipment, and debriefed the CW. I took from the CW a small, tightly knotted baggie of a substance consistent with crack cocaine. I searched the CW and the ATF undercover vehicle for contraband with negative results. I transported the baggie of suspected crack cocaine and the electronic equipment to the ATF office. The baggie was placed on a digital scale that showed a weight of 3.70 grams. I removed a small portion of the substance inside the baggie and placed it inside a Narcotics Analysis kit, which showed a positive color for cocaine. The baggie was then logged in as ATF evidence, stored in the ATF Group II evidence vault and then sent to the State drug lab for additional testing and certification (results pending). I burned the video/audio recordings to DVDs and logged them in as ATF evidence.

**March 21, 2019 Purchase of 43.28 grams of Cocaine Base from MARVIN FORBES**

24. On March 21, 2019, at my direction, the CW made a recorded call to FORBES and asked to purchase a large quantity (ounce or more) of crack cocaine. FORBES replied that he only had a "half" (half an ounce). FORBES then told the CW that he would call him/her back later. Later that same day, FORBES called the CW and stated that he couldn't really talk earlier, and again, said he could only get "half". The CW replied that he/she wanted something larger. FORBES said that he could get him/her (the CW) an ounce and a half, but it would have to be later. The CW replied okay and told FORBES that if he didn't have it today he/she (the CW) could make the purchase tomorrow (03/22/19). The call was recorded.

25. Later that same day, the CW called FORBES to get an update. FORBES told the CW that he was not able to get it (ounce and a half), but that he could get it the next day (03/22/19).

FORBES told the CW that as soon as he had it, he would call the CW and let him/her know. FORBES said that he thought he would have it by 12:00 p.m., and then assured the CW that he/she (the CW) would be taken care of. FORBES said he had many people waiting on him, but the CW was first on his list. The call was recorded.

26. On March 22, 2019, at approximately 11:59 p.m., the CW called FORBES to get an update. FORBES told the CW he was still waiting on his "boy" (drug supplier) and that he was aggravated that everyone was calling him. FORBES told the CW to have patience and that he would definitely have it today. The call was recorded. At approximately 3:22 p.m., FORBES called the CW and stated he had it. The CW replied okay and told FORBES he/she would call him right back. After instruction from me, the CW called FORBES and told FORBES that he/she (the CW) was on his/her way to make the purchase. FORBES told the CW to take his/her time because he had other people waiting on him too. The CW replied okay and that he/she would be there in forty minutes. The call was recorded.

27. At approximately 4:30 p.m., agents/officers and I met the CW at an undisclosed location to prepare for the controlled crack cocaine purchase. At approximately 4:35 p.m., the CW called FORBES and told FORBES that he/she (the CW) was in the city. FORBES told the CW to meet him near Ashmont. The CW asked FORBES to text him/her the address and FORBES replied that he would. The call was recorded. At approximately 4:44 p.m., the CW received a text message from FORBES that read, "Wells ave" (Welles Avenue, Dorchester).

28. I searched the CW and the ATF undercover vehicle, which was provided to the CW, for contraband with negative results. I provided the CW with $1,700 of pre-recorded ATF buy money to make the crack cocaine purchase. I equipped the CW with covert electronic recording and monitoring equipment.

29. At approximately 5:13 p.m., the CW departed the staging area operating the ATF undercover vehicle. The CW followed an unmarked ATF surveillance vehicle to Welles Avenue. After back and forth calls to FORBES, FORBES told the CW to drive down Argyle Street and make a left turn down the dead end street (Argyle Terrace).

30. At approximately 5:25 p.m., the CW drove down Argyle Terrace and viewed FORBES standing next to a parked black Jeep Grand Cherokee. This was the same black Jeep used by FORBES in the previous two sales of crack cocaine. The CW stopped and FORBES entered the front passenger seat. With his left hand, FORBES removed a large plastic baggie from his left side coat pocket and handed it to the CW. FORBES told the CW it (the baggie) was good and that it weighed 43 grams. FORBES then told the CW it was an ounce and a half and that he needed $1,750 for it. The CW replied that he/she would give him (FORBES) $1,700 and that is all he/she brought. FORBES smiled and said, "you got me" and agreed to take the $1,700. FORBES took the money and counted it. FORBES then pointed to the baggie, which the CW placed in the vehicle's middle console, and told the CW to make sure that he/she aired it out. FORBES got out of the vehicle and the CW drove to a predetermined location to meet me.

31. At the predetermined meet location, I met the CW, turned off the electronic equipment, and debriefed the CW. I took from the CW a large, tightly knotted baggie of a substance consistent with crack cocaine. I searched the CW and the ATF undercover vehicle for contraband with negative results. I transported the baggie of suspected crack cocaine and the electronic equipment to the ATF office. The baggie was placed on a digital scale that showed a weight of 43.28 grams. I removed a small portion of the substance inside the baggie and placed it inside a Narcotics Analysis kit, which showed a positive color for cocaine. The baggie was then logged in as ATF evidence, stored in the ATF Group II evidence vault, and then sent to the State

drug lab for additional testing (results pending). I viewed the covert video/audio recordings and determined the seller to be FORBES.

**April 4, 2019 Purchase of Approximately 3.74 grams of Cocaine Base from MARVIN FORBES**

32.     On April 4, 2019, the CW made a recorded call to FORBES to arrange for the purchase of crack cocaine later that same day. The CW told FORBES he/she wanted to purchase something small, like the first time. FORBES told the CW to call him when he/she was ready. The call was recorded. At approximately 2:54 p.m., the CW called FORBES to tell FORBES that he/she was in the area. FORBES answered and told the CW to meet him at the original spot (lot on Normandy Street). The CW replied okay and told FORBES he/she would be there in ten minutes. The call was recorded.

33.     Prior to the CW meeting FORBES, the same pre-deal procedures described above were conducted. Agents/officers, driving unmarked police vehicles, took up positions near Normandy Street and Intervale Street. At approximately 3:14 p.m., the CW departed the staging area operating the ATF undercover vehicle. The CW followed an unmarked ATF surveillance vehicle to the Intervale Street area. Surveillance officers viewed a black Jeep parked in the lot. This was the same black Jeep used by FORBES in the previous crack cocaine sales to the CW. Surveillance officers observed that the Jeep was occupied by two people, with an occupant sitting in the driver's seat and an occupant sitting in the front passenger seat.

34.     At approximately 3:22 p.m., the CW drove into the lot and parked next to the Jeep. FORBES exited from the driver's seat of the Jeep and entered the front passenger seat of the ATF undercover vehicle. FORBES removed a baggie from his right side pants pocket. FORBES opened the plastic baggie, removed a smaller plastic baggie, and handed the smaller baggie to the

CW. The CW took the smaller baggie of suspected crack cocaine and placed it in the vehicle's middle console. The CW then counted two hundred dollars in cash and handed it to FORBES, who exited the vehicle.

35. At approximately 3:40 p.m., the CW arrived at the predetermined location, where I turned off the electronic equipment, and debriefed the CW. I took from the CW a small, tightly knotted baggie of a substance consistent with crack cocaine. I searched the CW and the ATF undercover vehicle for contraband with negative results. I transported the baggie of suspected crack cocaine and the electronic equipment to the ATF office. The baggie was placed on a digital scale that showed a weight of 3.74 grams. I removed a small portion of the substance inside the baggie and placed it inside a Narcotics Analysis kit, which showed a positive color for cocaine. The baggie was then logged in as ATF evidence and stored in the ATF Group II evidence vault. This item will be forwarded to the State drug lab for additional testing. I viewed the covert video/audio recording and determined the seller was FORBES.

## CONCLUSION

36. Based on the foregoing, I submit that there is probable cause to believe that, on March 5, 2019, March 8, 2019, March 21, 2019, and April 4, 2019, MARVIN FORBES did distribute and possess with intent to distribute cocaine base, a Schedule II controlled substance in violation of Title 21, United States Code, Section 841(a)(1).

I declare that the foregoing is true and correct to the best of my knowledge and belief.

_____
MATTHEW SHIBLEY
SPECIAL AGENT, ATF


Subscribed and sworn to before me this 28th day of May, 2019.

_____
HON. DONALD L. CABELL
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS

